2024 IL App (1st) 231534-U

SIXTH DIVISION

July 26, 2024

No. 1-23-1534

NOTICE: This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| MICHAEL QUALIZZA, | ) | Appeal from the Circuit Court |
| | ) | of Cook County. |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | No. 23 L 504 |
| | ) | |
| NEIL D. FREEMAN, JOHN REED PERKAUS, and | ) | |
| PERKAUS & FARLEY, LLP, | ) | Honorable |
| | ) | Michael F. Otto, |
| Defendants-Appellees. | ) | Judge, presiding. |

JUSTICE C.A. WALKER delivered the judgment of the court.
Presiding Justice Oden Johnson and Justice Tailor concurred in the judgment.

**ORDER**

¶ 1    *Held:*    We affirm the circuit court's grant of appellees' motions to dismiss under section 2-615 of the Illinois Code of Civil Procedure (West 2020) because the court correctly found the absolute litigation privilege barred appellant's defamation claims.

¶ 2    Appellant Michael Qualizza appeals from the circuit court's dismissals of his (1) counterclaim against Appellee Neil Freeman and (2) third-party complaint against Appellees John Reed Perkaus and Perkaus & Farley, LLP (Freeman's attorney in the underlying litigation), both for defamation, arguing the court erred by finding the absolute litigation privilege protected the complained-of Publications. We affirm.

¶ 3                                    BACKGROUND

¶ 4    On January 18, 2023, in the underlying litigation from which this matter arises, a group of plaintiffs including Freeman filed a complaint against Qualizza and co-defendant Chad Goodall, alleging in relevant part that Qualizza engaged in "egregious misconduct" relating to a business operated through the entities Aries Community Capital, LLC (ACC) and Urban Development Fund, LLC (UDF). The business provided "loans and investments to borrowers in low-income communities using federal and state tax credits issued through New Market Tax Credit (NMTC) Programs." Qualizza was Vice President of ACC and manager of UDF. Regarding NMTC programs generally, the complaint stated, "NMTC Programs are intended to address historic under-investment in low-income communities by using tax credits to attract private capital for qualifying investments in those communities."

¶ 5    The complaint further explained that Qualizza and Freeman formed ACC and UDF to administer the NMTC business venture. The project began with the federal NMTC project, operated by ACC. At the time of ACC's formation, "Aries (Freeman's company) held 47% of ACC's membership interests; QSG (Qualizza and Goodall's' company) held 41% of ACC's membership interests," and another partner, Edward James Keledjian, held 12%. After an amendment, the complaint explained, the split between Aries and QSG changed to 46% each.

2

¶ 6     The business venture expanded to state NMTCs in 2011. The parties involved in ACC created UDF ST to manage the state venture, allegedly at Qualizza and Goodall's insistence. QSG (and then its successor, QGH, also controlled by Qualizza and Goodall) held 80% of UDF ST's membership interest, while Aries held 20%. "[F]ees paid to ACC ultimately were distributed roughly 46% to Freeman's company, 46% to Qualizza and Goodall's company, and 8% to Keledjian's company whereas fees paid to UDF ST were distributed roughly 80% to Qualizza and Goodall's company and 20% to Freeman's company."

¶ 7     With this structure in place, the complaint alleged that Qualizza and Goodall, "[l]ured by the conflict of interest created through the divergent ownership of ACC and UDF ST," exploited "their extensive control over the NMTC business to misappropriate millions of dollars of fees." Specifically, Qualizza and Goodall took "termination [fees] that should have been split between the federal and state NMTC administrative managers (ACC and UDF ST, respectively), and instead direct[ed] 100% of those fees entirely to UDF ST" such that the "proportion did not reasonably correspond to the administrative services or contribution that UDF ST provided to the projects." The misappropriation allegedly injured both ACC and UDF.

¶ 8     The complaint then listed specific NMTC programs in which UDF ST allegedly diverted termination fees. Relevant here, UDF 41 and 48 "was a project that involved the provision of financing to Florida-based Big Brothers Big Sisters (specifically, Big Brothers Big Sisters of Miami Institute, Inc.) (BBBS Miami) for the acquisition, development, and improvement of property to be used as a mentoring and community facility located in Miami, Florida." The project consisted of $6.5 million in federal NMTC and $6,417,094 in Florida NMTC. Despite this split, UDF ST collected 100% of the $64,171 termination fee.

¶ 9    The complaint alleged that Qualizza kept Freeman and Keledjian "in the dark" while conducting this scheme, and never provided notice that UDF ST was collecting 100% of the termination fees. Ultimately, Qualizza was removed as UDF's manager, after which Freeman assumed management and discovered the termination fee diversion scheme. The complaint included counts of breach of fiduciary duty, breach of contract, conversion, aiding and abetting, civil conspiracy, and defamation.

¶ 10    On February 21, 2023, Qualizza filed a counterclaim against Freeman and a functionally identical third-party complaint against Perkaus and Perkaus & Farley, LLP, with both pleadings alleging defamation. The counterclaim and third-party complaint identified the individuals to whom the defamatory statements were published (hereinafter "recipients) as follows:

"4. Anne E. Bruneel is senior counsel and an attorney employed by the law firm of Husch Blackwell LLP located in St. Louis, Missouri.

5. Mark V. Bossi is a partner and an attorney with the law firm of Thompson Coburn LLP, located in St. Louis, Missouri, representing U.S. Bancorp, one of Qualizza's lenders.

6. [Mike] Bartolacci is a partner and an attorney with the law firm of Thomson [sic] Coburn LLP, located in St. Louis, Missouri, representing U.S. Bancorp, one of Qualizza's lenders.

7. Richard Perez is employed as the Chief Financial Officer of the Big Brothers Big Sisters of Miami, Florida.

8. Gale S. Nelson is employed as the President and Chief Executive Officer of Big Brothers Big Sisters of Miami, Florida.

9. Daryl P. Jacobs is a partner and an attorney with the law firm of Ginsburg Jacobs LLC located in Chicago, Illinois.

10. Chad Goodall is a citizen and resident of the State of Illinois and is a business partner of Qualizza.[1]

11. Brooke Roseberry is employed as a Vice-President, Senior Asset Manager in New Market and Historic Tax Credits of U.S. Bancorp Community Development Corporation located in St. Louis, Missouri.

12. Andrew Rondozai is employed as the Manager of Client Services for Twain Financial Partners located in St. Louis, Missouri.

13. Angela Conover is employed as a Senior Vice-President of the Urban Development Fund located in Chicago, Illinois.

14. Favad Mallick is employed as the Executive Vice-President of Operations of the Big Brothers Big Sisters of Miami, Florida.

15. Matthew J. O'Connor is an attorney with the law firm of Ginsburg Jacobs LLC located in Chicago, Illinois.

16. Daniel L. Kraus is a partner and an attorney with the law firm of Kraus Lam LLC located in Chicago, Illinois."

¶ 11 Substantively, Qualizza alleged that on February 20, 2023, Perkaus sent an email (Publication #1) to the recipients at Freeman's direction, in which Perkaus defamed Qualizza. Specifically, Qualizza complained that Perkaus wrote:

"In response to your inquiry regarding status of the BBBS Miami closing I have attached our complaint filed in Cook County Illinois detailing how Mr. Qualizza and Mr. Goodall through their control over the entities involved misdirected over $6 million in fees from the

---

[1] There are obvious questions arising from the fact that Goodall is a defendant in the underlying litigation and copied on the email chain, but such questions are beyond the scope of our review.

5

federal entity to the state entity UDF NMTC ST which was 80% owned and controlled by Qualizza and Goodall. As alleged in our complaint, Mr. Freeman only discovered these illegal transfers after he wrested [sic] control of UDF on August 12, 2022, from Mr. Qualizza in his successful Delaware litigation last year. Mr. Qualizza's alleged illicit actions regarding BBBS Miami are detailed in the complaint in UDF 41 and 48."

¶ 12    Qualizza claimed that Publication #1's statements that Qualizza "misdirected over $6 million in fees," committed "illegal" acts, and engaged in "illegal transfers" and "illicit actions" were all defamatory *per se*.

¶ 13    Publication #1, which Qualizza attached to his pleadings, consists of an email chain which contained Perkaus' February 20, 2022 email. The chain begins with Perez inquiring on the status of the funding from NMTC for BBBS Miami. Bruneel responds, copying the other recipients listed above, whom she describes as the "distribution list" for the BBBS Miami funding issue, and asking the UDF team to explain the project's status. Perkaus responds to the same distribution list, in relevant part, as detailed above.

¶ 14    Qualizza further claimed that the complaint, "Publication #2," which Perkaus attached to the email, also contained defamatory statements. Specifically, Qualizza complained of the allegations in the complaint that he:

   (a) engaged in "egregious misconduct" which related to the "misappropriation of millions of dollars of fees";

   (b) "hatched a scheme to abuse [his] control in violation of [his] duties to the other owners of the NTMC business";

   (c) "succeeded in diverting and misappropriating more than $6.25 million in termination fees";

6

(d) "hid" his "scheme" from "the other owners" for "years";

(e) had his "misconduct *** eventually discovered"; and

(f) "decided to exploit [his] extensive control over NTMC business to misappropriate millions of dollars of fees."

Qualizza claimed the above statements, along with the references in the complaint to his alleged conduct as "diversion," were defamatory *per se*. He attached Publication #2 to his pleadings.

¶ 15    Finally, Qualizza alleged that in an email on February 21, 2023, "Publication #3 (also attached to Qualizza's pleadings)," Freeman republished Publication #1 to the same recipients, and added "[i] suggest that the courts can decide whether Mr. Qualizza and Mr. Goodall misappropriated millions of dollars without the knowledge of the majority owners of [UDF]," a defamatory *per se* statement. Publication #3 also attached the complaint.[2]

¶ 16    On April 24, 2023, Freeman filed a motion to dismiss Qualizza's counterclaim under section 2-615 of the Illinois Code of Civil Procedure (735 ILCS 5/2-615 (West 2020)) (Code). In the motion, Freeman argued in relevant part that the communications were protected by the absolute litigation privilege. Qualizza opposed the motion, arguing the privilege did not apply because the recipients were not parties to the underlying litigation and were not mentioned in the complaint. Moreover, Freeman could not move to dismiss under section 2-615 because to establish that the privilege applied, he needed to submit admissible evidence, which cannot be done in a section 2-615 motion. Freeman replied, arguing Qualizza's arguments were based on outdated caselaw, and current controlling law made it clear the privileged applied, citing *Bedin v. Northwestern Memorial Hospital*, 2021 IL App (1st) 190723; *Scarpelli v. McDermott Will & Emery LLP*, 2018 IL App

___

[2] The third-party complaint only raised claims based on Publications #1 and #2.

(1st) 170874; *Doe v. Williams McCarthy, LLP*, 2017 IL App (2d) 160860; and *O'Callaghan v. Satherlie*, 2015 IL App (1st) 142152.

¶ 17    On June 26, 2023, the circuit court granted Freeman's motion. The court found, in relevant part, that the Publications were protected by the absolute litigation privilege. It explained that the privilege applied to pertinent statements, which are "statements that bear some relation to the subject in controversy even where the defamatory statement is not confined to specific issues related to the ligation," and emphasized that "any doubts regarding pertinency must be resolved in favor" of applying the privilege, citing *Bedin*, 2021 IL App (1st) 190723, ¶ 40. The court further maintained that a communication can also "involve a nonlitigant if he would have no reason to be in communication with the private party litigant, or his attorney, but for the nonlitigant's relation to the subject of that litigation," citing *Doe*, 2017 IL App (2d) 160860, ¶¶ 21-23.

¶ 18    The circuit court then found that each Publication was sufficiently pertinent to the litigation to qualify for the exception under Illinois law. Regarding Publication #1, it explained that the email summarized the complaint, and the fact that the recipients were nonlitigants did not defeat the privilege because the email was "pertinent to the judicial proceeding." Respecting Publication #2, the court wrote, "the absolute litigation privilege protects against defamation claims for statements contained in pleadings." Finally, regarding Publication #3, the court explained the email only summarized the complaint, and Freeman had the same privilege to communicate as Perkaus. Moreover, "as with Publication [#] 1, the recipients only received the email because of their relation to the case." In so finding, the court distinguished *Kurczaba v. Pollock*, 318 Ill. App. 3d 686 (2000), and *Golden v. Mullen*, 295 Ill. App. 3d 865 (1997).

¶ 19    On June 27, 2023, Qualizza moved for leave to appeal the dismissal of his counterclaim immediately pursuant to Illinois Supreme Court Rule 304(a) (eff. Mar. 8, 2016).

¶ 20   On July 18, 2023, Perkaus moved to dismiss the third-party complaint under section 2-615, contending dismissal was appropriate "[f]or the same reasons set forth in the Court's June 26, 2023 Order."

¶ 21   On August 7, 2023, the circuit court granted Perkaus' motion to dismiss the third-party complaint. The court included in the order a finding per Rule 304(a) that both the August 7, 2023 order and the June 26, 2023 order could be appealed immediately. This appeal followed.

¶ 22                            JURISDICTION

¶ 23   The circuit court granted Qualizza's request for a Rule 304(a) finding on August 7, 2023, and Qualizza filed his appeal on August 28, 2023. Accordingly, this court has jurisdiction pursuant to Illinois Supreme Court Rule 304(a) (eff. Mar. 8, 2016).

¶ 24                            ANALYSIS

¶ 25   On appeal, Qualizza's primary argument is that the circuit court improperly found his claims were barred by the absolute litigation privilege.[3]

¶ 26   The circuit court dismissed Qualizza's claims pursuant to section 2-615 of the Code. 735 ILCS 5/2-615 (West 2020). A section 2-615 motion to dismiss "challenges a complaint's legal sufficiency based on defects apparent on the face of the" pleading. *O'Callaghan*, 2015 IL App (1st) 142152, ¶ 18. When considering a section 2-615 motion, "the court must accept all well-pleaded facts, as well as any reasonable inferences to be drawn therefrom, as true." *Id.* In addition to the allegations in the pleading, the court can also consider information contained in attachments

---

[3] Appellees Perkaus and Perkaus & Farley, LLC argue that Qualizza's brief should be struck for failure of service per the requirements of Illinois Supreme Court Rule 11 (July 1, 2021). We decline. Appellees can show no prejudice form any alleged failure, as counsel obviously received and reviewed Qualizza's brief in light of the timely, substantive response thereto. See, *e.g.*, *Lachona v. Industrial Comm'n*, 87 Ill. 2d 208, 212 (1981) (A party must show prejudice to be entitled to relief for a Rule 11 violation, and there was no prejudice from appellant's failure to serve the notice of appeal where the moving party still filed a brief and argued orally).

to the pleading in ruling on a section 2-615 motion. *Dent v. Constellation NewEnergy, Inc.*, 2022 IL 126795, ¶ 25.

¶ 27   A defendant asserting privilege as a basis for dismissal typically moves pursuant to section 2-619 of the Code (735 ILCS 5/2-619 (West 2020)), under which a movant admits the allegations contained in the pleading and attachments but contends an affirmative matter bars the claim. *O'Callaghan*, 2015 IL App (1st) 142152, ¶ 19. Section 2-615 can be an appropriate vehicle for a defendant to assert the absolute litigation privilege, however, if the privilege's application is apparent on the face of the pleading and any attachments thereto. *Id.* ¶¶ 18-20.

¶ 28   We review *de novo* a circuit court's grant of a section 2-615 motion to dismiss based on the absolute litigation privilege. *Bedin*, 2021 IL App (1st) 190723, ¶¶ 38, 40.

¶ 29   The Restatement (Second) of Torts describes the absolute litigation privilege as follows: "An attorney at law is absolutely privileged to publish defamatory matter concerning another in communications preliminary to a proposed judicial proceeding, or in the institution of, or during the course and as part of, a judicial proceeding in which he participates as counsel, if it has some relation to the proceeding." Restatement (Second) of Torts § 586 (1977). The same protection is extended to the parties in litigation. *Id.* § 587. "The privilege is predicated on the tenet that although defendant's conduct is otherwise actionable, because he is acting in furtherance of some interest of social importance, the communication is protected." *Atkinson v. Affronti*, 369 Ill. App. 3d 828, 833 (2006).

¶ 30   The privilege applies to communications made before, during, and after litigation. *Bedin*, 2021 IL App (1st) 190723, ¶ 40. Illinois law has expanded the privilege beyond only protecting communications to apply to other attorney conduct so long as the conduct is in furtherance of representation. See *Scarpelli*, 2018 IL App (1st) 170874, ¶ 25.

¶ 31 The touchstone in determining whether the absolute litigation privilege applies is the "pertinency requirement." *Id.* ¶ 19. A communication is pertinent if it "relates to the litigation and is in furtherance of representation." *Id.* The pertinency requirement is not strictly applied, and any doubt is resolved in favor of finding a communication pertinent. *O'Callaghan*, 2015 IL App (1st) 142152, ¶ 25. Communication need not be confined to the specific issues of the litigation to be considered pertinent and thereby protected. *Bedin*, 2021 IL App (1st) 190723, ¶ 40 (citing *Malevitis v. Friedman*, 323 Ill. App. 3d 1129, 1131 (2001)).

¶ 32 Communication with a third party can be protected under the absolute litigation privilege when that third party has some interest in the litigation. *Doe*, 2017 IL App (2d) 160860, ¶¶ 22-23 (citing *O'Callaghan*, 2015 IL App (1st) 142152, ¶ 29). Conversely, when a third-party communication is unrelated to the case, the privilege may not apply. *Kurczaba*, 318 Ill. App. 3d at 705.

¶ 33 We find that it is clear from the face of Qualizza's counterclaim and third-party complaint, and the exhibits attached thereto, that the three Publications at issue are protected by the absolute litigation privilege, and thus the circuit court did not err in dismissing Qualizza's claims pursuant to section 2-615. The central issue we must address is the pertinency requirement, the "linchpin" of this area of the law. *Scarpelli*, 2018 IL App (1st) 170874, ¶ 23. Pertinency in this context depends on the resolution of two issues: (1) whether the Publications relate to the underlying litigation, and (2) whether the recipients of the Publications have a sufficient interest in that litigation. Following the guidance of *O'Callaghan*, *Scarpelli*, and *Bedin*, we conclude the Publications meet the pertinency requirement.

¶ 34 First, the email chain contained in Publication #1 demonstrates why each Publication qualifies as "related" per the requirements of the privilege. The email chain is initiated because

11

Perez, BBBS Miami's CFO, inquired regarding the status of UDF's funding. The three Publications all stem from this inquiry; Perkaus' email (Publication #1), to which he attached the complaint (Publication #2), and then Freeman's response to the chain (Publication #3), were all sent to the recipients to address Perez's initial question. Both emails seek to clarify the BBBS Miami funding situation as it relates to the status of the litigation. It is thus apparent from the face of Qualizza's pleadings, and attachments thereto, that the subject matter of the Publications is related to the litigation—Perkaus and Freeman would not have referenced the litigation, or attached the complaint to their emails, if not for the relevance of the litigation to the BBBS Miami funding situation. The emails may not have addressed specific termination fee splits, as Qualizza points out, but they do address how the ongoing litigation affected the status of one of the projects described in the complaint. This places each Publication well within the spectrum of communications protected by the absolute litigation privilege, particularly considering our caselaw which maintains that (1) the pertinency requirement is not strictly applied, (2) the communication need not deal specifically with the claims at issue in the litigation to be pertinent, and (3) all doubt is to be resolved in favor of applying the privilege. See *Scarpelli*, 2018 IL App (1st) 170874, ¶ 19.

¶ 35    Second, the recipients of the Publications were sufficiently interested parties such that the privilege applies. Qualizza's counterclaim and third-party complaint specifically explain how most of the recipients are interested. Additionally, in the email chain, BBBS Miami counsel Anne Bruneel states that she has copied her "distribution list" for the BBBS Miami closing in response to Perez's inquiry. The natural conclusion from Bruneel's statement is that the recipients on the distribution list had an interest in the BBBS Miami closing, which would make them "interested" parties per the privilege's requirements because the litigation involves the BBBS Miami project (UDF 41 and 48). The distribution list recipients were not random members of the public at large.

To characterize the recipients as not related is counter to our caselaw, which requires broad application of the privilege and encompasses communications to third parties so long as that communication would not have been made absent those third parties' interest in the litigation, a circumstance which is present here. See *Id.* ¶ 26 (citing *O'Callaghan*, 2015 IL App (1st) 142152, ¶ 29).

¶ 36   In so finding, we acknowledge that additional information regarding the recipients' specific interests in the litigation could have obviated any argument as to whether the emails were covered by the privilege, and the decision to proceed via section 2-615 instead of section 2-619 frustrated this potential. While the pleadings and exhibits here are sufficiently clear on their face to demonstrate the absolute litigation privilege applies (see *O'Callaghan*, 2015 IL App (1st) 142152, ¶¶ 18-20), we reiterate that a section 2-619 motion is the preferred method to raise an absolute litigation privilege defense.

¶ 37   Qualizza frames his arguments in the context of the Corpus Juris Secundum's (C.J.S.) four requirements for the privilege to apply, as set out in *Kurczaba:* the communication " 'was made in a judicial proceeding; had some connection or logical relation to the action; was made to achieve the objects of the litigation; and involved litigants or other participants authorized by law.' " *Kurczaba*, 318 Ill. App. 3d at 702 (quoting 53 C.J.S. *Libel & Slander* § 72, at 132 (1987)). This framework is simply not the law in Illinois, and we will not treat it as such. As our courts have consistently explained over the last decade, the standard is pertinency, and the privilege applies in many situations directly counter to the C.J.S.'s purported elements. For example, the privilege extends before and after litigation, and thus does not have to be made in a "judicial proceeding." *Scarpelli*, 2018 IL App (1st) 170874, ¶ 25 (citing *O'Callaghan*, 2015 IL App (1st) 142152, ¶ 26).

¶ 38 Additionally, the privilege extends to statements that are not specifically about the litigation, let alone made specifically to achieve the objects of the litigation. *Bedin*, 2021 IL App (1st) 190723, ¶ 40. And the communication can also be made to third parties beyond attorneys or the litigants so long as the pertinency requirement is met, notwithstanding any "legal authorization." *O'Callaghan*, 2015 IL App (1st) 142152, ¶ 29. Any argument that the Publications were not covered by the privilege because they did not strictly meet the C.J.S. test is baseless.

¶ 39 To the extent Qualizza's arguments can be reframed as pertinency challenges, they also fail. Qualizza claims the Publications are not pertinent because the recipients did not have a specific interest in the division of termination fees. This is too narrow a vision of pertinency. While the recipients may not be concerned with the specific dollar amounts Freeman, Qualizza, or their various entities ultimately receive, they are certainly concerned with the result of the case as it influences the future conduct of Freeman, Qualizza, and the entities concerning BBBS Miami, which satisfies the pertinency requirement. See *Scarpelli*, 2018 IL App (1st) 170874, ¶ 19.

¶ 40 Qualizza also attempts to defeat the privilege's application by citing to pre-*O'Callaghan* caselaw which declined to extend the privilege to communications with third parties. See *Edelman, Combs and Latturner v. Hinshaw and Culbertson*, 338 Ill. App. 3d 156, 165-66 (2003); *Kurczaba*, 318 Ill. App. 3d at 705; *Golden*, 295 Ill. App. 3d at 872. Each citation fails to override the directives of the *O'Callaghan* court and its progeny, discussed above. Regarding *Edelman* and *Kurczaba*, both base their rulings on the proposition that communications to third parties *with no connection to the lawsuit* are not protected, a scenario not present here. *Edelman*, 338 Ill. App. 3d at 1656 ("the privilege does not cover the publication of defamatory matter that has no connection whatsoever to the litigation"); *Kurczaba*, 318 Ill. App. 3d at 705 ("it is evident that Illinois clearly limits the attorney litigation privilege and has refused to extend it to third-party communications

unrelated to the lawsuit").[4] Additionally, regarding *Golden*, we find that this court in *O'Callaghan* and its progeny rejected the narrow approach outlined in *Golden* on which Qualizza relies. While the *Golden* court may have been "reluctant to expand the privilege to cover communications made by an attorney to persons other than the clients he or she represented in recently concluded litigation," our jurisprudence now routinely demonstrates no such reluctance. See *O'Callaghan*, 2015 IL App (1st) 142152, ¶ 29; see also *Atkinson*, 369 Ill. App. 3d at 832.

¶ 41    Qualizza's pertinency challenge also fails because the cases he cites pertain to one of two scenarios where the privilege will not apply, neither of which are at issue here. First, Illinois courts routinely decide that a statement is not covered when that statement is published to the public at large, either directly or via the press. See *August v. Hanlon*, 2012 IL App (2d) 111252, ¶ 36 ("the allegedly defamatory statements were made outside of the judicial proceeding to a newspaper reporter who was not connected to the lawsuit"); *Kurczaba*, 318 Ill App. 3d at 691 (publication to "various prominent members and institutions of the Chicago and Polish communities, including three Polish newspapers" and "the Chicago Tribune"); *Lykowski v. Bergman*, 299 Ill. App. 3d 157, 160 (1998) (publication to multiple newspapers and claimant's employer). The concerns underlying such a publication (i.e. damage to one's reputation within the community at large, members of which are likely completely unaware of the litigation) are irrelevant in this case. See *Kurczaba*, 318 Ill. App. 3d at 705-06. Perkaus and Freeman did not leak the complaint to the press

---

[4]    We acknowledge the *Edelman* opinion can be read to limit who can have a "connection" to a case: "Here, the face of the complaint is devoid of allegations that [the third parties] were opponents or shared a common opponent in pending litigation. The only facts alleged in the complaint describing [the third parties] is that they are "attorneys" with no relationship to the [litigation]." *Edelman*, 338 Ill. App. 3d at 166. To the extent the *Edelman* court intended to so limit the privilege's application, we decline to follow this aspect of *Edelman* because it predates *O'Callaghan* and its progeny, which have established that a person can have a connection to a litigation without being a litigant or attorney in the litigation itself. See *O'Callaghan*, 2015 IL App (1st) 142152, ¶ 29.

or distribute it to the general public; they communicated in the context of an email chain consisting of 13 recipients, all of whom had an interest in the pending litigation.

¶ 42    Second, Illinois courts may limit the privilege when the statements are published to family members of interested parties. See *Thompson v. Frank*, 313 Ill. App. 3d 661, 664 (2000) (communication at issue was from "one party's attorney to the spouse of the opposing party"); *Golden*, 295 Ill. App. 3d at 867 (communication to the wife of a former client). Publications #1 and #3 were not sent to Qualizza's spouse, family, or friends; they were made to parties with an interest in Qualizza's conduct relating to BBBS Miami. Thus, the Publications do not fit either of the two broader scenarios contemplated by the caselaw Qualizza cites, and his arguments pursuant to those two lines of cases must fail.

¶ 43    Apart from the pertinency requirement, Qualizza also maintains that the privilege should not apply because the Publications did not address an issue of "social importance." See *Atkinson*, 369 Ill. App. 3d at 833. This argument fails because whether a statement addresses an issue of social importance is a justification for the privilege's existence, not an element for its application. *Id.* Moreover, even allowing that this is a substantive consideration, the Publications are consistent with an attorney's zealous representation of his client, which is the type of conduct and communication the privilege is meant to protect, as explained in *Scarpelli*, 2018 IL App (1st) 170874, ¶¶ 17, 29-31. The Publications consist of communications from an attorney, and then his client, to a small group of people with whom the client has business interests, explaining how the status of the litigation affects those interests. In this context, the policy objectives of the privilege are furthered by its application.

¶ 44    Finally, Qualizza argues the circuit court erred because section 2-615 was an improper mechanism to bring these motions. *O'Callaghan*, however, stands for the proposition that this

specific type of case can be resolved on a section 2-615 motion to dismiss, even if a section 2-619 motion is the traditional and preferable method, provided the basis for the privilege is apparent on the face of the pleading and its attachments. *O'Callaghan*, 2015 IL App (1st) 142152 ¶¶ 18-20. As explained above, those requirements are met by the description of the recipients in Qualizza's pleadings, and the additional information contained in the email chains in Publications #1 and #3. See *infra* ¶¶ 34-35.

¶ 45    In closing, we note that because we find the absolute litigation applies to protect the Publications, we do not reach Qualizza's arguments regarding whether the Publications are defamatory *per se* or capable of innocent construction.

¶ 46                                        CONCLUSION

¶ 47    Based on the face of the counterclaim/third-party complaint and the attachments thereto, it is apparent that the three Publications at issue satisfy the pertinency requirement such that the absolute litigation privilege applies to each. Accordingly, we affirm the circuit court's grant of appellees' motions to dismiss under section 2-615.

¶ 48    Affirmed.